JO MOONYEEN HODGES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hodges v. Commissioner
Docket No. 19682-80.
United States Tax Court
T.C. Memo 1985-56; 1985 Tax Ct. Memo LEXIS 577; 49 T.C.M. (CCH) 689; T.C.M. (RIA) 85056; February 5, 1985. Larry A. Koch, for the petitioner. Mary Sparr and Thomas J. Miller, for the respondent. COHEN
*2 MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $116,658.59 in the Federal income tax liability of petitioner and Lloyd L. Hodges, petitioner's former spouse, for the taxable year ending December 31, 1976. The issues presented are (1) whether petitioner was a party to a joint return for 1976 or signed the subject return under duress and (2) whether petitioner is entitled to deductions for depreciation of certain automobiles. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation is incorporated herein by reference. Petitioner was a resident of Santa Monica, California, *578 at the time she filed her petition herein. Prior to and during the year 1976, petitioner was married to Lloyd L. Hodges (Hodges). On or about October 17, 1977, petitioner and Hodges executed a Form 1040, U.S. Individual Income Tax Return, for the year 1976, and submitted that return to the Internal Revenue Service. On that return, income was reported on one Schedule C for a contract equipment sales business operated by Hodges and on a separate Schedule C for a business operated by petitioner under the name Model Maintenance. The business operated by Hodges was reported to have a net profit of $689,334.72, and the business operated by petitioner was reported to have a net profit of $5,205.09. The combined profit of $694,539.81 was reported as earned income on Form 4726, Maximum Tax on Earned Income, and tax was computed on that *691 schedule on the basis of a 50 percent maximum tax for such earned income, pursuant to section 1348. [1] The return reported tax due of $315,341.83. *579 On April 16, 1979, an Interlocutory Judgment of Dissolution of Marriage was entered by the Superior Court of California for the County of Los Angeles, in a proceeding brought by petitioner for dissolution of her marriage to Hodges. In that judgment, the Superior Court found that the parties had separated on November 11, 1977; that "all assets acquired from March of 1974 to date of entry of this interlocutory judgment are owned equally by the parties hereto and either were acquired while the parties were domiciled in California or traceable to assets acquired while the parties were domiciled in California, and at a time * * * [that both parties] had their principal residence in California"; that certain property was separate property of Hodges and that other property, including assets of Hodges' contract equipment sales business, was community property. The *4 judgment of the Superior Court also contained the following provisions: 11. A. Ward and Heyler is awarded the sum of $350,000 for attorney's fees and the sum of $14,269.77 for costs advanced by said firm for preparation of the trial in the above-entitled matter. B. Gursey, Schneider & Co. is awarded the sum *580 of $100,000 for fees and expenses in connection with the preparation of and participation in trial, and as accounting fees and expenses. C. Irving Feffer, Esq. is awarded the sum of $25,000 for attorney's fees, for services rendered in connection with the filing of this action and various proceedings through January of 1978. D. Berry & Berry, attorneys in Oklahoma City, Oklahoma, is awarded the sum of $19,950. E. Norman H. McNeil, Esq. is awarded the sum of $3,500 for tax services rendered to petitioner. * * * 12. It is further ordered that any income tax refunds by virtue of any amended income returns that have been filed or may be filed by the parties hereto, or by the receiver, or otherwise, shall be owned equally by the petitioner and respondent. * * * 16. Petitioner is awarded as her separate property the business known as Model Maintenance Co.
On July 10, 1980, the Commissioner sent to Hodges and to petitioner the statutory notice for the year ended December 31, 1976, on which this proceeding is based. The notice to petitioner was sent to her in care of the accountants who had been awarded $100,000 in fees during the dissolution proceedings. In the statutory *581 notice, income from petitioner's Model Maintenance Co. was increased by $9,916.54; depreciation on certain automobiles was disallowed; insurance, bad debt, and *5 travel and entertainment expense deductions were adjusted; and it was determined that, because capital was a material income producing factor in the businesses, the earned income for maximum tax purposes was limited to 30 percent of the adjusted net profit of the two businesses ($713,592.53). Tax was thus determined at marginal rates in excess of 50 percent on the business income. On October 14, 1980, a letter from petitioner's accountants, dated October 8, 1980, was filed as the petition in this proceeding. That letter set forth in great detail certain allegations about the business conducted by Hodges and stated that the determination set forth in the statutory notice "failed to recognize an incorrect method of accounting and reporting of taxable income as related to the Hodges Company." On October 27, 1980, the Court issued an Order for Proper Petition and Filing Fee, advising petitioner that the letter from her accountants had been filed as a petition but did not comply with the rules of the Court as to form *582 and content for a proper petition. An Amended Petition was filed on December 11, 1980; that amended petition also complained of the accounting method used in determining the business income of Hodges' business. In response to the statutory notice, Hodges filed a petition that was filed in docket No. 18964-80. That case was consolidated with this case by Order made November 5, 1981. Thereafter various proceedings occurred with respect to respondent's attempt to compel production of certain documents from petitioner and from Hodges. On August 4, 1983, a *6 stipulation was filed in both cases, in which Hodges and respondent agreed that Hodges conceded the adjustments of the statutory notice, and respondent and Hodges agreed that, as between them, the sole issue remaining for resolution pertained to the maximum tax adjustment. By notice dated March 14, 1984, the case was set for trial in Oklahoma City, Oklahoma, on June 5, 1984. Shortly prior to trial, Hodges and respondent entered into a settlement of docket No. 18964-80. On June 8, 1984, when the case was called for trial, counsel entered his appearance for petitioner and tendered to the Court a second amended petition *583 that alleged that at the time of signing the 1976 return, petitioner was acting under duress. The amended petition further alleged that a short time before petitioner signed the return, she was beaten by Hodges and, during that time period, she was physically dragged from a public rest room by Hodges. Petitioner had been in contact with one or more attorneys for respondent throughout the years between the date of the notice of deficiency through the time of trial. The first time that petitioner ever claimed that she signed the 1976 return under duress was during a conversation with one of counsel to respondent about 10 days prior to the trial. She had, however, during the Superior Court litigation discussed her liability for taxes for 1976 with the attorney who handled the dissolution of her marriage. *7 Petitioner and Hodges filed joint tax returns for years prior to and including 1975 and did not have differences over the filing of any returns prior to 1976 or 1977. Petitioner never tendered to respondent a separate return reporting income of her business for the year 1976. At the time of trial of this case, petitioners conceded respondent's determination that her business *584 had additional income of $9,916.51 (a total of $15,121.63) for 1976. ULTIMATE FINDINGS OF FACT The 1976 return executed by petitioner was intended to be a joint return and was not the result of duress. OPINION The material facts set forth above are primarily recital of procedural history. Our resolution of this case, however, for the reasons set forth below, is substantially affected by that procedural history. We have not made any specific findings with respect to the circumstances surrounding the actual execution of the return by petitioner in October 1977 because of the lack of reliable evidence that, as discussed below, petitioner had the burden of presenting. Hodges, called as a witness by respondent, denied that he beat petitioner or otherwise forced her to sign the tax return. Hodges' testimony is more consistent with the undisputed history than is petitioner's. Even without consideration of Hodges' testimony, however, we would find petitioner's testimony unpersuasive. *8 Petitioner similarly has not provided adequate evidence for any findings of fact as to business usage of automobiles. On that ground alone, the claimed deductions are disallowed. Because *585 of our resolution of the issues in the manner set forth above, we need not decide whether the income from the business operated by Hodges during 1976 was community income and therefore taxable to petitioner to the extent of 50 percent of that income. [2]
*586 *9 The Joint Return
The applicable law was most recently summarized in [Diane] Stanley v. Commissioner,81 T.C. 634, 637-638 (1983), as follows: Although a joint return results in joint and several liability, a return, even if it bears the signature of both spouses and is designated on its face as a joint return, does not create joint and several liability with respect to a spouse whose signature on the return was executed under duress. Brown v. Commissioner,51 T.C. 116, 119 (1968), and cases cited therein. Where a spouse disavows the signing of a joint return, the spouse must show both (1) that he or she was unable to resist demands to sign the return, and (2) that he or she would not have signed the return except for the constraint applied to his or her will. Brown v. Commissioner,51 T.C. at 119. This must be determined under a uniform Federal standard. [Hazel] Stanley v. Commissioner,45 T.C. 555, 562 (1966). The self-determination of such action is measured by a wholly subjective standard, *587 i.e., "whether the pressure applied did in fact so far affect the individual concerned as to deprive [her] of contractual volition." Furnish v. Commissioner,262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part 29 T.C. 279 (1957). By their very nature, cases on this issue are decided upon the peculiar factual situations involved. * * * Petitioner has not met the second requirement, i.e., she has not persuaded us that she would not have signed the 1976 return except for constraint applied to her will. In this regard we are influenced strongly by the failure to raise the issue prior to trial, particularly in view of the fact that she received legal and accounting services, valued by the California court at a total exceeding $500,000, in litigation in which her income and her tax liability were necessarily in issue. [3] At the *10 time of that litigation, 1977 events were relatively fresh, and petitioner admits that she discussed them with counsel. On this entire record, we conclude that the claim of duress was an afterthought arising only when it appeared that all other attempts to defeat the deficiency had failed. See *588 and compare Estate of Aylesworth v. Commissioner,24 T.C. 134, 146 (1955); Federbush v. Commissioner,34 T.C. 740, 745 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); [Hazel] Stanley v. Commissioner,45 T.C. 555, 564 (1966). *589 *11 Petitioner contends that she did not raise the issue earlier because she was "pro se" in this proceeding and was never asked a particular question about her signature on the return. [4] Given the intense legal and accounting effort and expertise that was apparently expended in relation to the dissolution proceedings, we find it inherently incredible that, if the elements of duress existed as she now claims, her counsel in the dissolution proceedings would not have taken some action to attempt to repudiate the return. *590 If we were to assume that force influenced petitioner's execution of the 1976 return in October 1977, one inference that might be drawn from the record is that petitioner and her California counsel deliberately determined that petitioner had more to gain by ratifying the return than by disavowing it. Under these circumstances, inaction by petitioner worked to the detriment of respondent, who entered into a settlement with Hodges on the basis of a joint return. Petitioner's continuing failure to file a separate return reporting her separate business *12 income, now admitted to be in excess of $15,000, casts further doubt on her present claim. This case is, in that respect, indistinguishable from Estate of Aylesworth v. Commissioner,24 T.C. at 146, where we said: We are not convinced on the evidence before us that her signature was not voluntary, regardless of her reluctance to sign and regardless of the domestic frays that may have occurred at about the time. We are of the opinion that when she in fact signed the returns they were her voluntary, although perhaps distasteful, acts. So far as we know she never undertook to disavow her signature on any *591 of the returns within a reasonable time so that the Government might promptly have proceeded against the husband for increased tax by reason of the higher brackets that would be applicable to his individual return; and, as noted above, she filed no separate return of her own * * *. In any event, we are not persuaded that petitioner's account of the circumstances surrounding the execution of the return is reliable. Briefly, she contends that she and Hodges commenced a discussion of their 1976 tax return at their home in San Diego, California, on October 16, 1977. She claims that she refused to sign the return because Hodges said that he was not going to pay the taxes due on the face of the return but was going to take the money and go to Brazil. Petitioner did not wish to go to Brazil. Petitioner claims that a fight ensued during which Hodges knocked her down and began to bang her head on the floor. At this point, a woman who was house-sitting entered the house. The police were called, and petitioner and the house-sitter left for Los Angeles. They stopped at a hospital, where petitioner was examined. When she arrived in Los Angeles, petitioner contacted her friend, Sheila *592 Renour, who arranged for petitioner to stay at a *13 hotel. The following day, petitioner contacted Hodeges and asked him to meet her at a lawyer's office. At the lawyer's office, petitioner again refused to sign the return. When she left the lawyer's office, she went to a restaurant. Hodges followed her there.According to petitioner, she went into the ladies' rest room and called Renour, but Hodges came into the rest room, grabbed her arm, and dragged her out of restaurant. Thereafter, at Renour's home, Hodges insisted that she sign the return and she complied. Hodges, of course, denies that he hit petitioner or that he dragged her out of the restaurant. He claims that she tripped on a rug in their home and hit her head. There is no direct corroboration of petitioner's account. The house-sitter was not called as a witness, and her absence was not explained. No police report was offered in evidence. The hospital report in evidence states only: "Pt. states she hit her head (right side) on floor. States she could not completely close her jaws but they seem to have gone back in place." Petitioner did call as witnesses Renour and a physician who briefly examined petitioner *593 at Renour's home after petitioner signed the tax returns. Renour and the physician testified that petitioner was hysterical when they observed her, but they did not witness the alleged physical abuse by Hodeges. The physician conducted a superficial examination and listened to petitioner's account of an altercation with Hodges; he told her not to do anything for a few days. Neither Renour nor the physician kept *14 any notes about the incident, and their recollection of the event, over 6-1/2 years later, must be weighed with consideration of the fact that they are friends of petitioner. No witness offered any plausible explanation for petitioner's failure to disavow the tax return after she was free of Hodges or to file a separate return. Moreover, it appears from petitioner's somewhat inconsistent testimony that her reluctance to sign the return was based more upon the large amount of taxes due than on any suspicion that the return was not correct. She claims that she inquired as to whether she might not be better off filing a separate return. She had almost 7 years, however, after signing the return and prior to trial of this case to have her professional advisors make *594 a decision as to whether or not she would have been better off filing a separate return. Her failure to do so prior to the judgment in the dissolution action supports an inference that they concluded that she would be better off as things stood.Although the judgment did not specifically deal with tax liabilities for the year in issue or any other year, it did provide that any refunds would be owned equally by the parties. The most logical conclusion, consistent with the entire record, is that petitioner would have signed the return, regardless of physical violence by Hodges, because it was to her ultimate advantage to do so -- as shown by her failure to repudiate the return until the time of trial in *15 this case. She has certainly not carried her burden of showing otherwise. Auto Expenses
Petitioner claims that respondent's denial of depreciation deductions with respect to three automobiles used in the businesses operated by Hodges and by petitioner was "clearly arbitrary and capricious." The only evidence offered by petitioner in this regard, however, was her testimony that the three cars were used by petitioner, Hodges, his sons, her son, and unidentified workers *595 at various places. She did not provide any evidence or even an estimate of actual miles traveled or expenses incurred. Although claiming that, as to one car, "I used it all the time for business," when asked the percentage of business use, she stated: If I would need to go to the grocery store or whatever I was doing, I would either do it on the way home or, I used that car for whatever I needed it. On this record, it borders on the frivolous for petitioner to complain that respondent's disallowance of the unsubstantiated deductions is arbritrary and capricious. Petitioner had the burden of proving the extent to which one or more of the automobiles was used for business, and she failed to do so. See Welch v. Helvering,290 U.S. 111 (1933); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Rule 142(a), Tax Court Rules of Practice and Procedure.
*16 Because of the pendency of a post-trial motion not dealt with in this opinion, An appropriate order will be issued.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. Section 1348(a) as in effect during 1976 generally limited the maximum rate on earned taxable income to 50 percent. Earned income was defined in part by reference to section 911(b), which stated: In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.↩
2. Petitioner for the first time in her opening brief contends that there is an issue as to whether the income was community property, contending that we are not bound by the judgment of the California court on this issue and that, even if the property were community property, petitioner is entitled to a theft loss deduction. At the time of trial, petitioner's counsel stated that the issues were as set forth in respondent's trial memorandum, to wit, (1) the propriety of the method of accounting for and reporting income of the business operated by Hodges and (2) duress. We assume that the excuse that might be offered for the repeated and belated tendering of new issues is that petitioner was relying on Hodges to carry the burden of these proceedings -- another factor consistent with our finding that she intended that the 1976 return be a joint return. We here note our disapproval of raising new issues after trial in a case that has been pending for more than 4 years. In any event, there is inadequate evidence in the record to support petitioner's contentions with respect to the nature of the income and the alleged theft. Petitioner baldly asserts, without reason or authority, that respondent has the burden of proof on these issues and has presented no evidence. Although respondent did address petitioner's contentions in his brief, without complaint, the Court objects to being put in a position of deciding an issue on inadequate evidence where the other party has not been given notice prior to trial that the contentions are being made. Any consent by respondent to consideration of these issues is not binding on the Court.↩
3. The judgment of the Superior Court awarded spousal support to petitioner. California Civil Code section 4801 (West 1983) provides in part: (a) * * * In any judgment decreeing the dissolution of a marriage or a legal separation of the parties, the court may order a party to pay for the support of the other party any amount, and for such period of time, as the court may deem just and reasonable. In making the award, the court shall consider the following circumstances of the respective parties: (1) The earning capacity of each spouse, taking into account the extent to which the supported spouse's present and future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported spouse to devote time to domestic duties. (2) The needs of each party. (3) The obligations and assets, including the separate property, of each. (4) The duration of the marriage. (5) The ability of the supported spouse to engage in gainful employment without interfering with the interests of dependent children in the custody of the spouse. (6) The time required for the supported spouse to acquire appropriate education, training, and employment. (7) The age and health of the parties. (8) The standard or living of the parties. (9) Any other factors which it deems just and equitable.↩
4. She testified: Q. Mrs. Freeman, why haven't you brought up this, the Judge has alluded to this and the case has alluded to this, why haven't you brought up this duress defense before? A. I didn't know it was a defense until the IRS man told me the week before, which was the week before I came here to see you, that I could. And it was when he was questioning me about some things that I said, well, how could I do that unless I wanted to get beat up again. And he said, what are you talking about? And I told him. And he said, well, you have a better case on that than anything else. And so I started looking into it to see what I could do.↩