**Joseph N. ROMM and Helen K. Romm, his wife, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 7366.

United States Court of Appeals Fourth Circuit.

Argued March 14, 1957.

Decided May 27, 1957.

---

Warren W. Grimes, Washington, D. C., for petitioners.

Arthur I. Gould, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and I. Henry Kutz, Attorney, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER and SOBELOFF, Circuit Judges, and HUTCHESON, District Judge.

SOBELOFF, Circuit Judge.

This is a petition to review the decision of the Tax Court holding the petitioner liable for income tax deficiencies and fraud penalties for the years 1942–46.

The year 1946 is open for deficiency assessment by the taxpayer's waiver of limitations, but the years 1942–45 are closed by limitations, unless the taxpayer filed fraudulent returns with the intent

to evade taxes in those years. Internal Revenue Code of 1939, Section 276(a), 26 U.S.C. (1952 ed.) Section 276(a). The Tax Court found that the returns for those years were fraudulent and not closed to assessment.

Deficiencies were found for all five years, and the Tax Court concluded that as part of the deficiency in each year was due to fraud, the taxpayer was liable for the 50% penalty on the entire deficiency of each year as provided by the Internal Revenue Code of 1939, Section 293(b), 26 U.S.C. (1952 ed.) Section 293(b). Part of the deficiency for 1946 had already been paid, but the Court imposed the penalty on that amount as well as on the sum still due. The amounts of deficiency and penalty found to be owing are set out below.

| Year | Income Tax | Additions to the Tax |
|------|------------|---------------------|
| 1942 | $ 2,159.56 | $ 1,079.78 |
| 1943 | 2,145.22 | 1,072.61 |
| 1944 | 15,745.65 | 7,872.83 |
| 1945 | 16,853.67 | 8,426.84 |
| 1946 | 4,445.69 | 12,065.43 |

### I.

■ The petitioner advances the contention that because no joint returns were ever filed, and only Joseph Romm filed individual returns, the Tax Court erred in holding Joseph Romm and his wife, Helen, jointly and severally liable for the deficiencies and penalties. The deficiency notice named them as jointly and severally liable and the petition for review by the Tax Court was brought in both names, in accord with the rules, but the Commissioner conceded, in the Tax Court and here, that the husband alone is liable. Taxpayer urges that the Tax Court was without jurisdiction, or, in any event, committed reversible error in not limiting liability to the husband. The contention is unsubstantial. While the Court undoubtedly committed an inadvertent error, which must be corrected, it was not prejudicial to taxpayer. Inasmuch as the deficiency notice contained an assertion of liability against Joseph in-

dividually, the Tax Court was not precluded from exercising jurisdiction. Accordingly, the case will be disposed of on the merits.

### II.

■ For many years, the petitioner, Joseph N. Romm, has been engaged in the retail sporting goods and bicycle servicing and repair business in Washington, D. C., trading under the name of Mount Vernon Cycle and Sports Shop, a sole proprietorship. He also operated a public bicycle concession in Potomac Park, and another bicycle rental business known as the Riverside Bicycle Academy, which was under the sole management of Harold Smith, and later James Butler. These men ran the Academy under an agreement that Romm would supply the bicycles, and that the profits would be distributed on a 70–30 basis after expenses, 70% going to Romm and 30% to the manager. It was stipulated that Romm also received substantial income from rental property during the years 1943–46.

In determining the deficiency, the Commissioner utilized the net worth method of reconstructing petitioner's income in the questioned tax years. The computation revealed taxpayer's yearly increase in net worth, and to this sum was added $5,200 annual living expenses and the federal taxes previously paid. The total for each year was determined by the Commissioner to represent petitioner's taxable income for that year.

If certain disputed assets in the name of taxpayer's wife, Helen K. Romm, are omitted, the net worth analysis, as found by the Tax Court, shows the following as the taxpayer's net income as compared with the income reported:

| Year | Computed Income | Reported Income |
|------|-----------------|-----------------|
| 1942 | $12,052.20 | $ 6,206.98 |
| 1943 | 10,435.00 | 6,195.30 |
| 1944 | 34,635.77 | 6,044.41 |
| 1945 | 36,529.00 | 7,523.40 |
| 1946 | 54,553.62 | 11,655.92 |

Taxpayer agrees that the government was justified in using the net worth

method of determining income. For the most part he does not dispute the mathematical correctness of the computations, nor does he challenge the amounts for the various items. The only issue raised as to the net worth computation and the deficiency determined therefrom, is whether certain assets in the name of the wife should be included in the husband's net worth. It is the Commissioner's theory that these assets, consisting of U. S. Savings Bonds and several saving accounts, are attributable to the taxpayer's income and should be included. This the taxpayer contests.

Mrs. Romm came to this country in 1914, with $4,000. She married the taxpayer in 1916 and continued to work until 1921, earning six to eight dollars per week. At the end of 1941, she had assets totalling $2,258.95. The Commissioner determined that this amount represented the remainder of the original $4,000, augmented by her earnings. The taxpayer had gone through bankruptcy in the early 1930's, and from 1932 to 1941 had either filed no tax returns or reported little income. Nevertheless, in 1934 he had purchased a residence for $4,750. In the light of these facts, the Tax Court concluded that inroads had been made on the wife's savings, and agreed with the Commissioner that Mrs. Romm's assets at the end of 1941, amounting to $2,258.95, correctly represented what was left of her savings. Her year-end balances thereafter increased, and at the end of 1946 totalled $9,066.94.

The Tax Court held that with the exception of one savings account (found to represent independent savings of a daughter), in part of the proceeds of a $1,000 insurance policy (purchased by Mrs. Romm in 1924 and redeemed in 1944), the increases in her year-end balances were derived from the taxpayer's income, and should be included in the net worth computation of tax deficiencies.

In opposing the inclusion of these funds, taxpayer points to testimony by the wife and daughter that Mrs. Romm hoarded cash for many years; that she saved large sums from earlier earnings and also from the weekly allowances given her by Romm for the household expenses. The two inferences which the Tax Court was invited to draw are, first, that she had more than $2,258 at the beginning of the tax period, and second, that increases in her accumulated funds during the tax period stemmed from the household allowance made her by her husband for the family living expenses which amounts had already been included in the net worth analysis. This testimony, however, did not dissuade the Tax Court from upholding the Commissioner's inclusion of these assets in determining taxpayer's income and tax delinquency. The burden was on the taxpayer to overcome the Commissioner's determination, and we think the Tax Court not incorrect in holding that the taxpayer did not sustain his burden.

This testimony of the wife contained much inconsistency. At first she said she did not work after her marriage in 1921. Later, when government counsel sought to elicit testimony that her savings were invaded for the family living expenses in the 1930's she testified that she did work at the time to "help out." Still later, apparently hoping to fortify the claim that she had accumulated large savings in the 1930's, she again contradicted herself by saying that she saved everything which she earned in those years. Palpably, there is no reconciliation of these three versions—that she didn't work, that she worked and contributed to the family's support, and that she worked and retained all of her earnings. Considering the character of the evidence which was unconvincing to the Tax Court, we cannot say the findings below were clearly erroneous.

It is also contended that a $2,000 loan from Mrs. Romm to her husband in 1946 should have been deducted from petitioner's net worth. There is no merit in this contention, because if the money is regarded as Mrs. Romm's, it would nevertheless be includable in the taxpayer's net worth computation since, if it had not been loaned, her year-end

balance for 1946 would have been $2,000.-00 higher. This additional $2,000.00 would have been includable in the husband's net worth analysis along with the balance hereinbefore discussed.

### III.

The next major issue raised in the petition relates to the finding of fraud. Upon this issue depends the assessability of the deficiencies for 1942–45—which are otherwise barred by limitations—and the fifty percent penalty for those years and 1946 as well. The question being basically factual, our inquiry is whether or not the Tax Court's decision is clearly erroneous. Title 26 U.S.C.A. § 7482. See Commissioner of Internal Revenue v. Smith Paper, Inc., 1 Cir., 222 F.2d 126, 128; Farnsworth & Co. v. Commissioner, 5 Cir., 203 F.2d 490.

■ In our judgment, the finding of fraud is amply supported. For five consecutive years there was a gross discrepancy between income earned and income reported, the income earned being, at times, approximately four hundred percent higher.

■ While a consistent pattern of large understatements of income may not alone be sufficient to sustain the Government's proof of fraud, it is a strong circumstance when accompanied by other indicia of willfulness. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Beard v. United States, 4 Cir., 222 F.2d 84; Lipsitz v. Commissioner, 4 Cir., 220 F.2d 871; Rogers v. Commissioner of Internal Revenue, 6 Cir., 111 F.2d 987. Here the evidence indicates that the taxpayer knew of the disparity, and the Tax Court was so persuaded. We cannot say that this evaluation of the evidence, and the inference therefrom of fraudulent intent, is patently erroneous.

The taxpayer's knowledge of the disparity is readily inferrable from several circumstances. Between November 7, 1941, shortly before the beginning of the tax years involved, and December 31, 1946, the end of the period, the petitioner submitted five net worth statements to the City Bank of Washington for credit purposes, and he discussed them with the bank president. Each successive statement showed a marked increase in the petitioner's net worth, far in excess of the income reported, even if the real estate included in the statements is reduced from its market value to cost as was done in the Tax Court. As the Commissioner points out, the total growth in net worth revealed by these credit statements, when the realty is reduced from market to cost, is $161,762.19, while the income reported was merely $37,626.01.

Though we are referred to testimony of the bank president that Romm did not have a clear understanding of certain accounting details, the evidence indicates that he understood the total figures in the statements and their significant bearing on his financial status. Despite this awareness, he, for five years, signed tax returns reporting far less. Petitioner sought to show that he had no understanding of the returns, and that he merely signed whatever his bookkeeper McMillan put before him. The record discloses, however, that though the computations from the books were done by McMillan, Romm nevertheless had a part in preparing the returns. Not only did he supply detailed itemized figures of personal deductions to be claimed, but also McMillan himself testified that Romm knew the contents of the returns, and that the two of them discussed the income reported and the amount of the tax.

Significant also is other evidence of prosperity. The taxpayer paid off a mortgage of $26,500 between 1943 and 1946, bought a new summer home at Ocean City, Maryland, for $19,000 more that he received for the old home, and advanced his wife $26,000 for their household expenses over the five years. These three major expenditures, of which he obviously knew, alone represented over $71,000 that passed through his hands during these five years; and yet he reported only $37,626.01 income for the same period. Moreover, in connection with the mortgage referred to, there was revealed a circumstance, frequently pres-

ent in tax fraud cases, which is not unmeaningful here. It was shown at the trial that of the thirty-one payments on this mortgage between 1943 and 1946, only thirteen were made by check. A permissible inference is that the remaining eighteen, paid in cash, came from hidden funds. While it would not necessarily follow that these sources, if untaxed, had been accumulated from 1942–46 income, the practice has relevant bearing on the taxpayer's intentions and general state of mind.

Beyond this abundance no more evidence is needed. But there is more. The Tax Court thought it significant, as do we, that Romm did not, in the years in question, report any income whatever from the Riverside Bicycle Academy. As previously noted, this rental business was under the sole management of other individuals who paid current expenses out of receipts. Each week the gross receipts were turned over to Romm, and at the end of the season in October it was divided on a 70–30 basis, 70% going to Romm. From the records introduced in evidence, it was clear that Romm's share of the net profits, after deducting the cost of rent for the season (Spring to October) was $4,707.27 in 1943, $1,882.91 in 1944, $2,359.70 in 1945, and approximately $2,000 in 1942 and 1946 each. Undeniably, petitioner knew he was receiving income from this source. A revenue agent testified that Romm had told him he realized almost $2,000 per year from the operation. Nevertheless, no income from the Academy was ever reported.

Taxpayer offers several explanations for the omission. One is that the rent for the off-season and the cost of the bicycles were paid by himself after the net receipts were divided. The plain answer is that the off-season rent alone was too negligible to wipe out his profits, and the only tax year in which bicycles were bought was 1946, and this would not explain the failure to report income in the four previous years.

It was also asserted by taxpayer that he and his manager had an agreement that the latter would pay taxes. This the manager denied, and even beyond the question of veracity, the Tax Court was not required to accept it as an adequate explanation.

All this evidence, which fully supports the inference of fraud, taxpayer sought to overcome by testimony that he was incompetent with figures and books and relied entirely on his bookkeeper, McMillan, to make his tax returns. And it was also suggested that McMillan himself was incompetent in these matters.

This evidence the Court was not obliged to believe as it depended in large part upon the credibility of the witnesses. Moreover, this evidence does not meet the issue squarely. The government was not attempting to prove that there was falsification merely in transferring figures from the books. The theory of its case was not so restricted. The inference they sought to sustain is that somewhere along the line, from actual sales in the petitioner's stores to the filing of the tax returns, substantial sums of income were knowingly and intentionally concealed by taxpayer—in short, that he knew that he had earned more than he reported.

This theory, well grounded in the evidence, is not negatived by suggestions of taxpayer's good faith based on his failure to claim certain deductions which he might have claimed. Testimony by members of Romm's family, that the home at Ocean City was used to entertain business guests, was of a self-serving nature. Like the testimony regarding McMillan's responsibility for the returns and his incompetence, its weight depended on nebulous and subtle factors of credibility perceptible to the factfinder, before whom the living witnesses appeared, but not readily gleaned from the record on appeal. The additional point that taxpayer could have, but did not, claim depreciation for the bicycles used at the Academy is without merit. Though depreciation was not expressly set out in the schedules provided in the returns, the bookkeeper, McMillan, testified that from 1942 to 1945 the bicycles were written off on a two year basis on

information obtained from the Bureau of Internal Revenue. Hence, taxpayer got the benefit of depreciation, apparently charging it off to costs not readily discoverable in an examination of the tax returns.

### IV.

■ Another argument advanced by the petitioner is equally lacking in substance. It is said that the fraud penalty should not be levied upon the portion of the 1946 deficiency which had been voluntarily paid before the deficiency notice was delivered. Before the deficiency notice was sent, taxpayer paid $24,-572.04, of which $16,436.79 was credited to the deficiency, $7,303.41 to interest, and $831.24 was designated as a 5% negligence penalty.

Taxpayer contends that the "deficiency" upon which the fraud penalty is levied by Section 293(b) is determined by the definition of "deficiency" contained in Section 271(a), 26 U.S.C.A. § 271(a). In general terms, the definition of Section 271(a) is that a deficiency is the amount by which the total tax liability exceeds the total of all amounts previously paid. We do not think that the word "deficiency" in Section 293(b) was meant to be so restricted. We agree with the Commissioner that it means the original deficiency in its entirety, as was held in Middleton v. Commissioner of Internal Revenue, 5 Cir., 200 F.2d 94. The fallacy of the construction proposed by taxpayer, and the folly of the result if his construction should be adopted, is made plain in the very facts before us. When the sum was paid by Romm, the investigation was already underway, as he had reason to know. By then paying the tax, he could not obliterate the consequences of the earlier fraud. As the Tax Court said in Still, Inc., v. Commissioner, 19 T.C. 1072, 1077, affirmed 2 Cir., 218 F.2d 639, such a result would allow fraudulent taxpayers to "make sport of the so-called fraud penalty."

### V.

■ We think, however, that in one respect the Tax Court committed error. When taxpayer paid part of the 1946 deficiency in advance of the deficiency notice, naturally no penalty of any kind had yet been assessed. No specific designation was made by the taxpayer or could have been made at that time as to the precise application of the fund; there was only one possible application, that is to say, to the deficiency. The Commissioner, however, allocated $831.24 to penalty for negligence, and a part to interest. The rest was applied to the deficiency in taxes. Later, when the Commissioner decided to impose the much larger penalty for fraud, he cancelled the negligence penalty of $831.24. It was at this time that the Commissioner, without consulting the taxpayer, applied the $831.24 to the fraud penalty rather than to the deficiency still owing. Taxpayer submits to us that this sum should have been credited to the tax deficiency, and we agree. When the assertion of negligence was discarded, the taxpayer technically became entitled to the $831.-24. If the money had been repaid to him, he would have had the option to designate the application of the fund to deficiency, which would have stopped interest on that amount. The taxpayer was not afforded this option, since the Commissioner undertook to decide the question for him. The result was that the interest continued running on the $831.24. There is no fair reason in principle or authority, why the taxpayer should be held liable for an accumulation of interest on a sum of money already paid.

The case is remanded to the Tax Court for modification of the order as to interest on the deficiency and as to the liability of taxpayer's wife. In all other respects, the decision is affirmed.

Affirmed and remanded for modifications.